BYRNES, Judge.
Plaintiff, Diane Mohr, alleges that on March 24, 1985, she was injured when an unknown roller skater collided with an unknown bicyclist on the 1.8 mile asphalt roadway which encircles the front of Audubon Park between St. Charles Avenue and Magazine Street. When the collision between the bicyclist and skater occurred, they were thrown into the plaintiff who was standing along the inside of the roadway on the Calhoun Street side of the Park. As a result of the collision, the plaintiff allegedly sustained a severe injury to her right ankle, which resulted in surgery and residual disability.
The plaintiff filed suit against the City of New Orleans, the State of Louisiana, the Audubon Park Commission and its insurers, the Constitution State Insurance Company and Pacific Employers Insurance Company.
*1097 Prior to trial, the State of Louisiana and the City of New Orleans were dismissed as defendants since neither political entity exercised control of Audubon Park. Additionally, Pacific Employers Insurance Company, an excess insurer for the Audubon Park Commission, was released from the lawsuit, the plaintiff having stipulated that her damages did not exceed the limits of the primary insurer’s coverage.
On October 22, 1991, the case proceeded to trial on the merits against the Audubon Park Commission and its primary insurer, Constitution State Insurance Company. Following the presentation of the plaintiffs case, the defendants moved for an involuntary dismissal. The trial court granted the defendants’ motion and entered judgment in their favor without written reasons. It is from that judgment that plaintiff now appeals. We affirm.
According to the undisputed testimony of Dale Stasny, deputy director of the Audubon Park Commission since the early 1980’s there were three signs reading: “Cyclist. (1) ride counter clockwise (2) keep to right (3) speed limit 10 mph (4) please be courteous.”
Plaintiff complains that: (1) there were not enough such signs; (2) that there were none facing riders riding clockwise to inform them that they were riding in the wrong direction; and (3) Audubon Park failed to take steps to enforce the signs.
Plaintiff’s assertion that “there was no mechanism in place to enforce the speed limit or direction of the cyclists until after March 24, 1985, the date of the injury at issue in this lawsuit” is contradicted by the very testimony of Mr. Stasny, which the plaintiff cites in support of that assertion:
“Our security guards, they patrolled and had a microphone that they could speak over from their vehicle and they were instructed to tell cyclists if they were going fast to slow down, but until the city ordinance was passed implementing the speed limit in city law, there was no ticketing mechanism that could be utilized.”
The record does not support plaintiff's contention that Audubon Park made “... no attempt [to] regulate these activities,” nor did plaintiff produce any proof that the accident in question was “inevitable” because Audubon Park failed to regulate the roadway in accordance with plaintiff’s standards.
Plaintiff’s attorney also elicited the following testimony from Mr. Stasny:
Q. From the time [the roadway] was closed to vehicular traffic until March of 1985, am I correct, that the park either through you or directly through the commissioners, received various complaints about speeding cyclists and about the mixed usages on that roadway between cyclists, runners and joggers, skaters? A. We did receive a variety of complaints about speeding cyclists. I don’t particularly recall of any complaints other than cyclists.
[[Image here]]
The level of enforcement prior to this date, although the enforcement regulation had nothing to do with this incident, and speeding cyclists were not involved in this incident. Prior to this incident the enforcement was limited to what the Audubon security guards could do in terms of notifying people, as well as NOPD notifying people that they were violating the signs, however, since it was not a city ordinance there was no ticketing mechanism and the city ordinance did not get passed until sometime later. I don’t recall the specific date. (Emphasis supplied.)
From this uncontroverted testimony cited by plaintiff it is obvious that Audubon Park was taking reasonable steps to enforce the cycling signs to the limited extent that it had the legal authority to do so in the absence of a city ordinance giving them the power to issue tickets.
Plaintiff’s expert, James Fondren, testified that:
I would add that there is a limit to the number of signs and the amount of information that you should give users of a park and recreation facility. Two things happen: He becomes confused with so many signs and doesn’t know what activ *1098 ities he is engaged in; second, it becomes a distracting visual experience to see a proliferation of signs.
This testimony by plaintiff’s expert echos the recently expressed feelings of this court in Henshaw v. Audubon Park Commission, 605 So.2d, 640, 643 (La.App. 4 Cir.1992), where we posed the following rhetorical question: “Would the public stand for a park defaced by signs on every tree to warn of a danger of which everyone is already aware?”
The thrust of plaintiff's case is directed almost completely against the failure of the Park to properly control cyclists, but if anyone “caused” the accident, it was the skater not the cyclists.
According to the uncontradicted testimony of plaintiffs witness, William J. Mares, Jr., there were two cyclists coming from the direction of Magazine Street headed towards St. Charles Avenue at a leisurely pace. From this testimony we may conclude that the cyclists were riding counterclockwise at substantially less than 10 miles per hour as required. Mr. Mares testified that the skater on the other hand was moving rapidly:
From what I could tell the bicyclists were riding casually, very casually. They weren’t exercising, they were riding together. They were talking and the skater to me was going out for exercises and he was really skating at a pretty fast rate.”
Plaintiff’s own expert Mr. James Fon-dren testified that: “It wasn’t really the bicyclist’s fault, it was the skater that perpetrated the accident.”
Therefore, accidents involving speeding cyclists, cyclists going the wrong way, cycling signs facing the wrong way, or an insufficient number of cycling signs are irrelevant.
Plaintiff suggests that Audubon Park was negligent in not hiring an outside consultant such as Mr. Fondren for advice on park layout and usage. Deputy director Dale Stasny explained this under cross-examination:
Q. Your decision that it was appropriate for the usages was made, sir, without consulting an expert in the field of landscaping architecture or in bicycle safety, is that correct?
A. I think we consulted with our staff and our experience that we had at that time and still have the expertise to make the decision that we made in 1983. And we did not call as I have testified several times, we did not call in an outside safety expert. (Emphasis added).
Mr. James Fondren, also testified that the asphalt roadway “surface was good” and that “the sight distances were excellent.”
As mentioned earlier plaintiff’s expert acknowledged the impracticality of too many signs, but testified that there should be signs warning of unforeseeable danger. Where the surface was good, sight lines were excellent, and the presence of bikes, pedestrians, skaters and joggers was obvious to all, this incident hardly seems to fall into the category of “unforeseeable danger.” By way of comparison pedestrians travelling on foot at a slow pace frequently collide. But we feel that the culprit is generally poor judgment and inattention, not the failure to post signs warning pedestrians of the obvious presence of other pedestrians.
Plaintiff’s expert opined that the Park also should have had signs regulating skaters. Although he professed to be an expert on the subject, when asked if it were standard practice for parks to have signs regulating skaters in 1985 he could only reply: “I am not aware.”
The accident did not occur near the entrance to the park. The accident occurred approximately midway between St. Charles Avenue and Magazine Street. Therefore, assuming the skater somehow arrived at the park unaware of the possibility of encountering pedestrians and cyclists on the roadway, he certainly became aware of that fact by the time he reached the point where the accident occurred.
As we noted in Henshaw, 605 So.2d 640, 643 (La.App. 4 Cir.1992):
*1099 We hardly see how a warning that if you fall you might get hurt,’ which is so obvious and universally known, would have supplied plaintiff with any useful information he did not already possess. Above a certain age one should not have to be told not to leap out of windows, etc., and there is no duty owned to inform plaintiff, of what he already knew. Adamski v. Burdell, 363 So.2d 1316 (La.App. 4 Cir.1978) cited by plaintiff is inap-posite. Adamski involved a collision between two automobiles:
... where Mr. Burdell entered Barracks Street, at French Market Place, there was no sign indicating that Barracks was a one-way street, and under the circumstances there was no way that he could have been aware that he should not turn right onto Barracks Street and proceed toward the river. Conversely, Ms. Adamski was familiar with the area and knew that Barracks Street was one-way, so she had no reason to believe that she would encounter a vehicle coming out of Barracks Street the wrong way. As a result, the trial court held that both Adamski and Burdell were exercising reasonable care, and that neither one was guilty of negligence causing the accident. The judge concluded that the failure of the City of New Orleans to sign Barracks Street, properly so as to designate it as a one-way street was the proximate cause of the accident.
Adamski is distinguishable from the instant case in the following material ways:
1. Mrs. Adamski, while proceeding in the proper direction down a one way street had no reason to anticipate or take precautions concerning an oncoming vehicle. The danger she encountered was truly unforeseen. In the present case the skater could not have been unaware of the presence of cyclists in the park.
2. The situation in Adamski was intrinsically much more hazardous and the margin for error much smaller as we may reasonably assume that the vehicles in Adamski were approaching each other at a far greater velocity than were the cyclists, who were moving at a leisurely pace, and the skater in the instant case.
3.It is reasonable to assume that the sight distances in the instant case which were described as excellent by the plaintiffs expert were far superior to the sight distances in Adamski, at least when relative velocities are taken into account. The only reasonable explanations for the collision in the instant case would be the skater’s inattention and/or reckless lack of control which were not the fault of Audubon Park.
In the instant case the skater obviously knew or should have known prior to the time he reached the point of impact that he could expect to encounter bicycles, pedestrians, etc.
Plaintiff contends that the layout of fitness stations on both sides of the road also created a hazard. The fact that a jogger might have to go back and forth across a road to use fitness stations is also irrelevant to the accident. There was no allegation nor proof that a jogger nor anyone else crossing back and forth between exercise stations had anything to do with this accident. Perhaps the trial court was impressed by the failure of plaintiff’s expert, Mr. Fondren, to make a convincing case of causation when asked if his recommended signage would have prevented the accident:
“Perhaps it would have not occurred. Accidents are going to occur under any circumstances in lots of situations ...”.
Or when plaintiff’s expert testified that “... I don’t recognize myself as a forensic expert in accidents ... ”.
Or when Mr. Fondren admitted that Tulane University which had been his employer for many years and which had a campus layout and usages (pedestrians, cyclists, skaters, etc.) resembling Audubon Park in virtually all ways relevant to the accident complained of by plaintiff, had never seen fit to adopt the types of recommendations he felt were so obvious for Audubon Park back in 1985.
Under the “manifest error” standard of Rosell v. ESCO, 549 So.2d 840 (La.1989) there was more than enough evidence in the record to support the decision of the trial court, including those findings implicit *1100 in the judgment. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987).
Plaintiff, obviously a faultless, innocent bystander, is the unfortunate victim of a freak accident. If we had the skater before us, we might be able to grant the plaintiff the relief she appears to deserve. But such is not the case.
Therefore, for the foregoing reasons we affirm the decision of the trial court.
AFFIRMED.
ARMSTRONG, J., concurs.